ALBERT B. SAMBAT (CABN 236472)
CHRISTOPHER J. CARLBERG (CABN 269242)
MIKAL J. CONDON (CABN 229208)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Avenue
Box 36046, Room 10-0101
San Francisco, CA 941092
Tel: 415.934.5300 /Fax: 415.934.5399
albert.sambat@usdoj.gov

CHRISTOPHER CHIOU
Acting United States Attorney
Nevada Bar Number 14853
ERIC C. SCHMALE
Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Tel: 702.388.6336 / Fax: 702.388.6418
eric.schmale@usdoj.gov
*Attorneys for the United States*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.:  2:21-cr-00098-RFB-BNW |
| Plaintiff, | |
| v. | **UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS INDICTMENT** |
| RYAN HEE; and VDA OC, LLC, formerly ADVANTAGE ON CALL, LLC, | |
| Defendants. | |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION .......................................................................................... 1

FACTS ............................................................................................................ 2

LEGAL STANDARD ..................................................................................... 3

ARGUMENT .................................................................................................. 5

I.    The Grand Jury's Indictment Properly Alleges A Per Se Violation Of Section 1 Of The Sherman Act.................................................................................................. 5

    A. Defendants' No-Poach And Wage-Fixing Conspiracy Constitutes A Per Se Section 1 Violation .................................................................................... 5

        1. Defendants' no-poach agreement is per se illegal market allocation, and their wage-fixing agreement is per se illegal price fixing ........................... 5

        2. Defendants offer no sound reason for creating a new exception to the per se rule for their market-allocating "no-poach" conspiracy........................ 9

    B. Defendants' Ancillary-Restraints Defense Lacks Merit. ....................................... 16

        1. Nothing in the indictment suggests that the no-poach restraint was subordinate and collateral to a separate, procompetitive venture.............. 16

        2. Nothing in the indictment suggests that the no-poach restraint was reasonably necessary to a separate, procompetitive venture .................... 19

II.   Prosecuting Defendants Under Section 1 Of The Sherman Act For Conspiring To Divide Labor Markets and Fix Wages Is Consistent With Due Process ....................................... 22

III.  Settled Precedent Forecloses Defendants' Challenge To The Constitutionality Of Applying The Per Se Rule To Their No-Poach Conspiracy ............................................... 23

IV.   The Indictment Establishes A Clear Factual Nexus To Interstate Commerce.................. 24

    A. The Indictment Alleges Conduct in the Flow of Interstate Commerce ................ 25

    B. The Indictment Alleges Conduct That Substantially Affected Interstate Commerce ....................................................................................................... 27

CONCLUSION................................................................................................ 30

# **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Shipowners' Ass'n*, 272 U.S. 359 (1926) ........................................................ passim

*Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332 (1982) ................................................ 9, 10,17

*Arizona v. Maricopa Cty. Med. Soc.*, 643 F.2d 553 (9th Cir. 1980) .......................................... 10

*Aydin Corp. v. Loral Corp*, 718 F.2d 897 (9th Cir. 1983) ...................................................... 12

*Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995) ......................................................... 19, 21

*Blue Cross & Blue Shield v. Marshfield Clinic*, 65 F.3d 1406 (7th Cir. 1995) ............................ 6

*Bogan v. Hodgkins*, 166 F.3d 509 (2d Cir. 1999) ............................................................... 12

*California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118 (9th Cir. 2011) ................................. 10

*Canadian Am. Oil Co. v. Union Oil Co. of Cal.*, 577 F.2d 468 (9th Cir. 1978) .......................... 25

*Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603 (E.D. Mich. 2012) ........................... 6

*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980) ................................................ 10, 11

*Chamber of Commerce v. Seattle*, 890 F.3d 769 (9th Cir. 2018) ........................................... 5

*Conrad v. Jimmy John's Franchise, LLC*, No. 18-00133, 2021 WL 3268339 (S.D. Ill. July 30, 2021) ......................................................................................................... 15

*Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) .......................................... 18

*Cordovcoa v. Bache & Co.*, 321 F. Supp. 600 (S.D.N.Y. 1970) ............................................. 6

*DeSlandes v. McDonald's USA, LLC*, No. 17-4857, 2021 WL 3187668 (N.D. Ill. July 28, 2021), 2018 WL 3105955 (N.D. Ill. June 25, 2018) .................................................................. 15

*Doe v. Arizona Hosp. & Healthcare Ass'n*, No. 07-1292, 2009 WL 1423378 (D. Ariz. Mar. 19, 2009) .................................................................................................................. 6

*Eichorn v. AT&T Corp*, 248 F.3d 131 (3d Cir. 2001) ......................................................... 12

*Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) ......................... 6, 28, 29

1   *Furlong v. Long Island Coll. Hosp.*, 710 F.2d 922 (2d Cir. 1983) ............................... 29

2   *Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975) ........................................ 25, 26

3   *Gulf Coast Hotel-Motel Ass'n v. Mississippi Gulf Coast Golf Course Ass'n*, 658 F.3d 500 (5th

4       Cir. 2011) ............................................................................... 30

5   *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59 (2d Cir. 1997) ........ 29

6   *In re Animation Workers Antitrust Litig.*, 123 F Supp 3d 1175 (N.D. Cal. 2015)..................... 8, 9

7   *In re Eur. Rail Pass Antitrust Litig.*, 166 F. Supp. 2d 836 (S.D.N.Y. 2001) ................................. 6

8   *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012) ......................... 8

9   *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464 (W.D. Pa. 2019).......... 8, 9

10  *Kelsey K. v. NFL Enterprises, LLC*, 757 F. App'x 524 (9th Cir. 2018) ....................................... 13

11  *L.A. Mem. Coliseum Comm'n v. NFL*, 726 F.2d 1381 (9th Cir. 1984)........................................ 13

12  *Law v. NCAA*, 134 F.3d 1010 (10th Cir. 1998)........................................................................ 20

13  *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007).................................. 4, 15

14  *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219 (1948) .................. passim

15  *Markson v. CRST Int'l, Inc.*, No. 17-01261, 2021 WL 1156863 (C.D. Cal. Feb. 10, 2021).... 9, 12

16  *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232 (1980).................... 24, 28, 29, 30

17  *Nash v. United States*, 229 U.S. 373 (1913) ............................................................................ 23

18  *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978)........................................... 20, 22

19  *NBA v. Williams*, 45 F.3d 684 (2d Cir. 1995) ............................................................................ 7

20  *NCAA v. Alston*, 141 S. Ct. 2141 (2021)......................................................... 4, 8, 14, 15,

21  *NCAA v. Bd. of Regents*, 468 U.S. 85 (1984)........................................................................... 14

22  *Neder v. United States*, 527 U.S. 1 (1999).............................................................................. 25

23  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ..................................................................... 4

24  *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990) ...................................................................... 6

*Polk Bros. v. Forest City Enter., Inc.*, 776 F.2d 185 (7th Cir. 1985)..................................... 17, 18

*Polygram Holding, Inc. v. FTC*, 416 F.3d 29 (D.C. Cir. 2005)........................................... 20, 22

*Premier Elec. Const. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358 (7th Cir. 1987)

.................................................................................................................... 18, 22

*Quinonez v. Nat'l Ass'n of Secs. Dealers*, Inc., 540 F.2d 824 (5th Cir. 1976) ............................ 8

*Reed v. Advoc. Health Care*, 268 F.R.D. 573 (N.D. Ill. 2009) ....................................... 6

*Roman v. Cessna Aircraft Co.*, 55 F.3d 542 (10th Cir. 1995) ........................................ 8

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210 (D.C. Cir. 1986) ..... 17, 18, 21

*Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1 (2000)........................... 15

*Standard Oil Co. v. United States*, 221 U. S. 1 (1911) ............................................ 23

*Summit Health, Ltd. v. Pinhas*, 500 U.S. 322 (1991)............................................. 24

*United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir.1898) (Taft, J.), *aff'd*, 175 U.S.

211 (1899) ..................................................................................... 16, 17, 19, 23

*United States v. Andreas*, 216 F.3d 645 (7th Cir. 2000)........................................ 6, 10

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015)..................................... 17

*United States v. Berger*, 473 F.3d 1080 (9th Cir. 2007) ...................................... 28

*United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101 (7th Cir. 1979) ........................ 24

*United States v. Brown*, 936 F.2d 1042 (9th Cir. 1991).................................... 4, 7, 10

*United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078 (5th Cir. 1978)..................... 7

*United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676 (5th Cir. 1981)................... 24

*United States v. Cinemette Corp. of Am.*, 687 F. Supp. 976 (W.D. Pa. 1988)..................... 23

*United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367 (6th Cir. 1988) ................ 7, 12

*United States v. eBay Inc.*, 968 F. Supp. 2d 1030 (N.D. Cal. 2013)........................... 8, 9

*United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183 (3d Cir. 1984)................... 24

*United States v. Giordano*, 261 F.3d 1134 (11th Cir. 2001)........................................ 24

*United States v. Jensen*, 93 F.3d 667 (9th Cir. 1996) ................................................ 4

*United States v. Joyce*, 895 F.3d 673 (9th Cir. 2018) ......................................... 5, 9, 10

*United States v. Kelly*, 874 F.3d 1037 (9th Cir. 2017)...................................... 4, 16, 20

*United States v. Koppers Co.*, 652 F.2d 290 (2d Cir. 1981) ................................... 7, 24

*United States v. Lanier*, 520 U.S. 259 (1997) .......................................................... 22

*United States v. Manufacturers' Ass'n*, 462 F.2d 49 (9th Cir. 1972) ..................... 1, 23

*United States v. Miller*, 771 F.2d 1219 (9th Cir. 1985) ............................................ 23

*United States v. Milovanovic*, 678 F.3d 713 (9th Cir. 2012) ............................... 4, 26

*United States v. Nukida*, 8 F.3d 665 (9th Cir. 1993)................................................ 16

*United States v. Oregon State Medical Society*, 343 U.S. 326 (1952)...................... 29

*United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980)................... 13

*United States v. Romer*, 148 F.3d 359 (4th Cir. 1998)........................................ 25, 26

*United States v. Sanchez*, 760 F. App'x 533 (9th Cir. 2019) *cert. denied*, 140 S. Ct. 909 (2020).

........................................................................................................................... 24

*United States v. Smith*, No. 19-00304, 2021 WL 1700045 (D. Nev. Apr. 29, 2021) .................... 4

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)........................... 4, 24

*United States v. Suntar Roofing, Inc.*, 897 F.2d 469 (10th Cir. 1990).......................... 6

*United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972)...................................... 12

*United States v. Vega-Martinez*, 949 F.3d 43 (1st Cir. 2020)......................... 25, 26, 27

*United States v. Vega-Martinez*, Indictment, 2015 WL 2441407 ............................. 27

*Verizon v. Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)........................................... 5

**Statutes**

15 U.S.C. § 1 ........................................................................................... 1, 4, 5

**Other Authorities**

Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. 2021) ................................... passim

**Rules**

Fed. R. Crim. P. 7(c)(1) ........................................................................... 3

# **INTRODUCTION**

Some antitrust cases are complicated.  This one is not.  Defendants violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring with their competitors to allocate nurses and fix the nurses' wages.  The former is market division.  The latter is price fixing.  Both are per se unlawful regardless of the industry and regardless of whether the conspirators are sellers, buyers, or employers.  *See* Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶2012c (5th ed. 2021) ("A naked agreement among employers limiting salaries or wages, such as an 'anti-poaching' agreement, is unlawful per se.").  The motion to dismiss for failure to state a per se offense should be denied.

Defendants cannot avoid that conclusion by describing their cartel as a "novel" or "ancillary" restraint.  It is neither.  The indictment plainly charges Defendants with imposing a naked horizontal restraint to divide the labor market and fix wages.  Nothing about that scheme was ancillary to a procompetitive venture.  Defendants and their coconspirators integrated no business operations, achieved no efficiencies, and created no new products or services.  Their only connection to one another was their unadorned conspiracy to allocate markets and fix wages.  Conspiring to deprive employees of the benefits of labor-market competition is hardly novel or procompetitive.  It is per se unlawful under Section 1.

Defendants' cursory due process theories also lack merit.  The first one fails because decades of precedent gave Defendants more than sufficient notice that fixing wages and allocating labor markets is per se illegal under Section 1.  Their second theory involving unconstitutional presumptions is even weaker, having been squarely foreclosed by Ninth Circuit precedent for almost 50 years—precedent Defendants fail even to cite much less distinguish.  *United States v. Manufacturers' Ass'n*, 462 F.2d 49, 52 (9th Cir. 1972) ("The *per se* rule does not operate to deny a jury decision as to an element of the crime.").

1

1   Lastly, Defendants improperly seek to constrict the jurisdictional reach of the Sherman

2   Act, contrary to Congress's intent and settled legal principles.  Congress purposefully framed

3   Section 1 in the broadest possible terms so that no aspect of our unified national economy would

4   be left unprotected from the cartels and monopolies that plagued the Gilded Age.  Defendants,

5   however, would artificially limit Congress's design by asking the Court to ignore the grand jury's

6   allegations that Defendants conducted business across state lines, sent money in interstate

7   commerce, used the interstate wires to carry out their conspiracy, and received payments supported

8   at least in part by federal funds.  These allegations readily suffice to plead the requisite nexus to

9   interstate commerce.  The motion to dismiss should be denied.

## **FACTS**

11   Defendants are a healthcare staffing agency (AOC) and its former regional manager (Hee).[1]

12   AOC is an Ohio company that provided contract healthcare staffing services in several different

13   states, including in Nevada.  Indictment ¶¶3, 12.  Hee was AOC's regional manager in Las Vegas

14   and was responsible for hiring nurses and developing new customers.  *Id.* ¶4.

15   Between October 2016 and July 2017, Defendants conspired with their competitors

16   (Company A and Individual 1) to suppress and eliminate competition by agreeing to allocate

17   nurses and to fix the wages of nurses.  Indictment ¶12.  Company A was also a healthcare-staffing

18   company, and Individual 1 managed recruitment and staffing of nurses in Southern Nevada for

19   Company A's Las Vegas office.  *Id.* ¶6.  AOC competed with Company A to attract, hire, and

20   retain healthcare personnel, including nurses.  *Id.* ¶7.  AOC and Company A were the two primary

21   providers of contract nurses to the Clark County School District ("CCSD").  *Id.* ¶¶8-9.

---

[1] "AOC" refers to Advantage On Call, LLC, the predecessor of Defendant VDA OC, LLC.  "Hee" refers to Defendant Ryan Hee, AOC's erstwhile regional manager.  Indictment ¶¶3, 12.

AOC, Hee, and their competitors conspired to allocate nurses between AOC and Company A. For example, in October 2016, Hee emailed Individual 1: "Per our conversation, we will not recruit any of your active CCSD nurses." Indictment ¶14a. Hee, AOC, and their competitors also agreed to refuse to negotiate any further wage increases with their nurses assigned to CCSD. *Id.* ¶14d. In the email described above, for example, Hee stated, "If anyone threatens us for more money, we will tell them to kick rocks!" *Id.* ¶14d. In response, Individual 1 wrote, "Agreed on our end as well. I am glad we can work together through this, and assure that we will not let the field employees run our businesses moving forward." *Id*. ¶14b. To carry out the conspiracy, AOC, Hee, and their competitors instructed certain Company A employees not to recruit or hire a coconspirator's nurses assigned to CCSD; refrained from recruiting or hiring each other's nurses assigned to CCSD; and refused to negotiate a pay-rate increase with at least one nurse assigned to CCSD with the knowledge that the nurse would not be able to negotiate a higher rate from the other company. *Id*. ¶¶14e-14g.

AOC's and Company A's business activities were within the flow of, and substantially affected, interstate commerce. Indictment ¶15. The payments CCSD made to AOC and to Company A, for example, traveled in interstate commerce. The payments AOC and Company A made to their respective nurses likewise traveled in interstate commerce. And the payments CCSD made to AOC and Company A were funded in substantial part by the State of Nevada, whose funding included a substantial portion of federal funding from Medicaid, managed through a federal agency based in Maryland and part of the U.S. Department of Health and Human Services. Both AOC and Company A also employed nurses in multiple states. *Id.* ¶¶15a-d.

## **LEGAL STANDARD**

Indictments must provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). In reviewing challenges to an

3

indictment, courts "are bound by the four corners of the indictment." *United States v. Kelly*, 874 F.3d 1037, 1047 (9th Cir. 2017).  They "presume the allegations of an indictment to be true" and "draw all reasonable inferences in favor of the government." *United States v. Milovanovic*, 678 F.3d 713, 717, 719 (9th Cir. 2012) (en banc).  Indictments cannot be dismissed based on extraneous evidence or fact-specific defenses that go beyond the grand jury's allegations.  *United States v. Jensen*, 93 F.3d 667, 669 (9th Cir. 1996) ("There is no summary judgment procedure in criminal cases."); *see United States v. Smith*, No. 19-00304, 2021 WL 1700045, at *1 (D. Nev. Apr. 29, 2021) (Boulware, J.) ("The indictment itself should be read as a whole, construed according to common sense, and interpreted to include facts which are necessarily implied.").

To charge a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, an indictment must allege that defendants knowingly entered into an unreasonable restraint of interstate trade. Restraints of trade are either "vertical" or "horizontal." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021).  Vertical restraints are agreements between firms operating at different market levels (*e.g.*, manufacturers and retailers).  *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 894 (2007).  Horizontal restraints are agreements between firms at the same market level (*e.g.*, rival manufacturers competing for sales or rival employers competing for labor).  *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 166-70 (1940); *see Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235-36 (1948) (buyer cartel); *Anderson v. Shipowners' Ass'n*, 272 U.S. 359, 361-65 (1926) (employer cartel).

Restraints can be unreasonable under one of two standards.  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018).  The first is a fact-intensive analysis of competitive impact under the rule of reason.  *NCAA v. Alston*, 141 S. Ct. 2141, 2151 (2021).  The second is the per se rule, which treats certain categories of restraints as inherently unreasonable.  *United States v. Brown*, 936 F.2d

1042, 1045 (9th Cir. 1991) ("[C]ase-by-case analysis is unnecessary when the restraint falls into a category of agreements which have been determined to be per se illegal.").

The per se rule typically applies to horizontal restraints, such as price fixing, bid rigging, and market allocation.  *United States v. Joyce*, 895 F.3d 673, 676-77 (9th Cir. 2018).  Such restraints can escape per se condemnation if "ancillary" to a separate procompetitive venture, meaning that they are "subordinate and collateral" to that venture and "reasonably necessary" to achieve its procompetitive goals. *Aya*, 9 F.4th at 1109.  Otherwise, "'collusion' among competitors is 'the supreme evil of antitrust.'"  *Chamber of Commerce v. Seattle*, 890 F.3d 769, 780 (9th Cir. 2018) (quoting *Verizon v. Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)).

## ARGUMENT

### I. The Grand Jury's Indictment Properly Alleges A Per Se Violation Of Section 1 Of The Sherman Act

The indictment charges Defendants with conspiracy "to suppress and eliminate competition for the services of nurses by agreeing to allocate nurses and to fix the wages of those nurses." Indictment ¶12.  Such conduct is a per se violation of the Sherman Act, 15 U.S.C. § 1. Allocating nurses is horizontal market division.  Fixing wages is horizontal price fixing.  Both are manifestly anticompetitive restraints subject to the per se rule, and Defendants cannot assert a plausible ancillary-restraints defense based on the four corners of the indictment.

#### A. Defendants' No-Poach And Wage-Fixing Conspiracy Constitutes A Per Se Section 1 Violation

##### 1.   Defendants' no-poach agreement is per se illegal market allocation, and their wage-fixing agreement is per se illegal price fixing

Defendants violated Section 1 of the Sherman Act based on two forms of per se illegal conduct: (1) market allocation in the form of a "no-poach" agreement to not solicit or hire

competitors' nurses; and (2) price fixing in the form of an agreement to suppress wages. Defendants argue that the per se rule does not apply to their "no-poach" agreement, but they do not deny that the indictment charges a per se violation based on the agreement to fix wages. MTD 5-16.  Nor could they.  Wage fixing is price fixing, *Anderson*, 272 U.S. at 361-65, and "[n]o antitrust violation is more abominated than the agreement to fix prices," *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1144 (9th Cir. 2003).[2]  That is reason enough for this case to proceed to trial under the per se rule.

But there is more.  Horizontal market allocation is arguably even worse than price fixing. When competitors "agree on what price to charge," they "eliminat[e] price competition among them," but when competitors "divide markets," they "eliminat[e] *all* competition among them." *Blue Cross & Blue Shield v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (Posner, J.) (emphasis added); *see Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 47-50 (1990) (holding market allocation per se illegal).  That is why such restraints have been criminally prosecuted as per se violations for decades, whether the conspirators are dividing territories, customers, or products. *See, e.g.*, *United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 473 (10th Cir. 1990) (affirming Section 1 conviction for allocating customers); *see also United States v. Andreas*, 216 F.3d 645,

---

[2] *Doe v. Arizona Hosp. & Healthcare Ass'n*, No. 07-1292, 2009 WL 1423378, at *2-4 (D. Ariz. Mar. 19, 2009) (holding that fixing wages of temporary nurses is per se unlawful price fixing); *see Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 624 (E.D. Mich. 2012) ("[A] conspiracy among competing hospitals to fix wages, like an analogous horizontal price-fixing conspiracy, would be subject to *per se* treatment."); *Reed v. Advoc. Health Care*, 268 F.R.D. 573, 581 n.6 (N.D. Ill. 2009) ("[A]n agreement among the defendants to fix Staff RN wages . . . would constitute a per se violation."); *In re Eur. Rail Pass Antitrust Litig.*, 166 F. Supp. 2d 836, 839-44 (S.D.N.Y. 2001) (holding that conspiracy among travel "wholesalers" to suppress travel-agent commissions was "horizontal price-fixing and therefore governed by *per se* analysis"); *Cordova v. Bache & Co.*, 321 F. Supp. 600, 608 (S.D.N.Y. 1970) (Mansfield, J.) ("[N]o authority supports the proposition that a group of employers may jointly agree upon the wages to be paid to their respective employees.").

666-67 (7th Cir. 2000) (same, allocating sales volume); *United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1372-73 (6th Cir. 1988) (same, allocating customers); *United States v. Koppers Co.*, 652 F.2d 290, 293 (2d Cir. 1981) (same, allocating territories); *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1088-90 (5th Cir. 1978) (same, allocating customers).

The Ninth Circuit has recognized, moreover, that the per se rule against horizontal market allocation applies with equal force when competing buyers agree to allocate *input* suppliers. In *United States v. Brown*, two billboard-advertising companies and their executives were convicted of violating Section 1 under a per se theory for agreeing not to bid on the other's former leaseholds. 936 F.2d at 1043-45. The executives argued on appeal that their agreement was not "a per se antitrust violation," but the Ninth Circuit had no trouble classifying it as a horizontal market-allocation restraint. *Id.* at 1045. The court explained that, by restricting "each company's ability to compete for the other's billboard sites," the agreement "clearly allocated markets between the two billboard companies," and therefore was "a classic per se antitrust violation." *Id.*

The same is true when competitors agree to divide labor markets. Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶352c (5th ed. 2021) ("Just as antitrust law seeks to preserve the free market opportunities of buyers and sellers of goods, so also it seeks to do the same for buyers and sellers of employment services."). Courts have long recognized that, outside the context of sports leagues and other ventures where certain restraints are necessary to create a new product, it is "*per se* illegal" for "employers who compete for labor" to "agree among themselves to purchase that labor only on certain specified terms and conditions." *NBA v. Williams*, 45 F.3d 684, 687 (2d Cir. 1995). Employer cartels are thus no different than any other per se unlawful buyer-side cartel, and they should be treated as such under Section 1. *See Mandeville*, 334 U.S. at 235-36 (holding that alleged conspiracy would violate Section 1 "even though the price-fixing was by purchasers");

*see In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 481 (W.D. Pa. 2019) ("Antitrust law does not treat employment markets differently from other markets.").

The per se rule likewise governs no-poach agreements. *See* Phillip Areeda & Herbert Hovenkamp, ¶2012c (noting that "an 'anti-poaching' agreement" is "unlawful per se."). Because labor is simply one type of "input," *Alston*, 141 S. Ct. at 2155, employers vying for the same workers create naked horizontal restraints by agreeing on the wages they will pay and the employees they will or will not hire. *See Anderson*, 272 U.S. at 361-65 (holding shipowners violated Section 1 by allegedly fixing wages, refusing to hire unregistered seamen, and prohibiting employers from hiring seamen assigned to other vessels). As courts have explained, "such no-switching agreements" "restrict the movement of the labor force" by prohibiting "interchange among employees." *Quinonez v. Nat'l Ass'n of Secs. Dealers*, Inc., 540 F.2d 824, 826, 828-29 & n.9 (5th Cir. 1976) (holding plaintiff alleged "a per se violation" where securities dealers agreed to "not hire a person who had either been rejected or discharged by another member firm"); *see Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543-45 (10th Cir. 1995) (recognizing that alleged conspiracy between employers "not to hire each other's engineers" would be an "illegal agreement"). The per se rule is, therefore, the appropriate antitrust standard for "a conspiracy to not hire or solicit employees between employers who compete with one another." *Ry Indus.*, 395 F. Supp. 3d at 481, 485 (holding that alleged "'no-poach' agreements" were "per se unlawful" naked "horizontal service division" restraints).[3]

---

[3] *In re Animation Workers Antitrust Litig.*, 123 F Supp 3d 1175, 1211-14 (N.D. Cal. 2015) (holding the per se rule applied to "conspiracy to suppress employee compensation by refraining from poaching each other's employees"); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1039 (N.D. Cal. 2013) (recognizing that "naked" "agreements among employers not to compete for employees" are "illegal per se"); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1120-22 (N.D. Cal. 2012) (holding that alleged "'Do Not Cold Call' agreements" would constitute

The indictment here charges similar cartel behavior as per se illegal under Section 1. Defendants and their coconspirators were supposed to be competing to "provide contract healthcare staffing services" and "to attract, hire, and retain healthcare personnel, including nurses." Indictment ¶7. Yet they instead conspired to fix wages by agreeing not "to negotiate any further wage increase with their nurses assigned to CCSD." *Id.* ¶14d. They also knowingly conspired "to allocate nurses" by, among other things, "agreeing not to recruit or hire each other's nurses," and by agreeing that "if an AOC or Company A nurse assigned to CCSD sought employment with the other company, the other company would notify the employing company immediately and would not discuss employment with that nurse." *Id.* ¶¶12, 14b, 14c. Such conduct, if proven, is per se illegal. *See Mandeville*, 334 U.S. at 235-36; *Anderson*, 272 U.S. at 364-65; *see also Ry Indus.*, 395 F. Supp. 3d at 481-85; *Animation Workers*, 123 F Supp 3d at 1211-14; *eBay*, 968 F. Supp. 2d at 1039; n.6; *Markson*, 2021 WL 1156863, at *4.

> **2.      Defendants offer no sound reason for creating a new exception to the per se rule for their market-allocating "no-poach" conspiracy**

The per se rule applies here because Defendants' conduct falls within the category of restraints long condemned as inherently anticompetitive. By agreeing not to compete for their rivals' nurses, and by agreeing to fix those nurses' wages, Defendants formed a buyers-side cartel to allocate the labor market and suppress wage competition. The illegality of that conspiracy under the Sherman Act is clear, regardless of Defendants' industry or their status as employers. *Supra* Part I.A.1; *see Joyce*, 895 F.3d at 678 ("[F]or purposes of the per se rule, it is irrelevant that Joyce's

---

"a *per se* violation"); *Markson v. CRST Int'l, Inc.*, No. 17-01261, 2021 WL 1156863, at *4 (C.D. Cal. Feb. 10, 2021) (holding plaintiffs "alleged a per se violation" where employers agreed "not to poach drivers that are 'under contract' with another competitor" (brackets omitted)).

bid rigging activities took place in any particular industry or during a downturn in the broader economy." (citing *Arizona v. Maricopa Cty. Med. Soc.*, 457 U.S. 332, 349-51 (1982))).

The Court should reject Defendants' newly minted employer-cartel exception to the per se rule against horizontal market allocation.  Defendants insist that courts have not had "sufficient experience" with no-poach agreements to conclude that they are per se unlawful, particularly "in the somewhat complex market of healthcare staffing agencies providing nurses to school systems." MTD 5-10.  In Defendants' view, this lack of "judicial experience" is "fatal."  MTD 1, 8.

Defendants misapprehend the role of "judicial experience" in the per se rule's application. Judicial experience informs the decision to recognize "a *new per se* rule."  *Arizona*, 457 U.S. at 351 n.19.  But deciding whether a particular horizontal restraint operates like, and should be treated the same as, other horizontal restraints subject to the per se rule depends on whether such "conduct falls squarely into a *category of economic restraint* necessarily prohibited by Section 1."  *See Joyce*, 895 F.3d at 677-78 (applying per se rule to bid rigging at foreclosure auctions as "a form of horizontal price fixing") (emphasis added); *Brown*, 936 F.2d at 1043-45 (similar, conspiracy to allocate "former leaseholds").  That is why the per se rule applies to horizontal restraints even if not "precisely identical" to those that "appear in the case law as a *per se* violation."  *Andreas*, 216 F.3d at 667 ("[T]he fact that the lysine producers' scheme did not fit precisely the characterization of a prototypical *per se* practice does not remove it from *per se* treatment."); *cf. California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134-37 (9th Cir. 2011) (en banc) (suggesting that the per se rule applies where a restraint can "sensibly be grouped together with or analogized to" those previously found to be "per se illegal").

Indeed, a restraint that is "tantamount to" per se unlawful conduct "falls squarely within the traditional *per se* rule."  *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 648-49 (1980).  In *Catalano*, the Supreme Court unanimously reversed a lower court's refusal to apply the per se rule

10

to an agreement among wholesalers eliminating interest-free credit.  *Id.* at 643-45.  Such a restraint, the Court explained, was essentially "an agreement to eliminate discounts" since credit terms are "an inseparable part" of price, and thus credit-fixing agreements operate like price-fixing agreements.  *Id.* at 648-49.  As a result, the Court held that, because an agreement to eliminate credit "is merely one form of price fixing, and since price-fixing agreements have been adjudged to lack any 'redeeming virtue,'" the wholesalers' credit-fixing restraint was per se "illegal without further examination under the rule of reason."  *Id.* at 650.

The Court employed a similar analysis in *Maricopa County* in applying the per se rule to agreements among physicians to set maximum reimbursement fees.  There, too, the lower court believed it did not have enough experience with the health-care practices at issue to apply the per se rule.  457 U.S. at 337-38; *see Arizona v. Maricopa Cty. Med. Soc.*, 643 F.2d 553, 560 (9th Cir. 1980) (Kennedy, J., concurring) ("[W]e know too little about the effects on competition produced by the practices here in question to brand them per se violations.").  The Supreme Court again reversed.  The Court held that the per se rule need not "be rejustified for every industry that has not been subject to significant antitrust litigation," and that, in any event, "horizontal agreements to fix maximum prices" stand "on the same legal—even if not economic—footing as agreements to fix minimum or uniform prices."  457 U.S. at 348-51.  The Court concluded therefore that, regardless of any asserted "procompetitive justifications," agreements to set maximum prices "fit squarely into the horizontal price-fixing mold."  *Id.* at 357.

The question, then, is whether Defendants' horizontal no-poach restraint, as charged in the indictment, operates like a restraint that falls within a category of per se illegal conduct.  The answer to that question is clearly yes: "'Anti-poaching' agreements, in which each of multiple firms promises not to hire one another's employees of a certain type, in fact operate as market-division agreements."  Phillip Areeda & Herbert Hovenkamp, ¶2013a.  And horizontal market-

division agreements are "classic examples of a per se violation" that the Supreme Court has "time and time again" treated as "naked restraints of trade with no purpose except stifling of competition." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972). Accordingly, because no-poach restraints "operate as a type of market division in employment markets," Phillip Areeda & Herbert Hovenkamp, ¶2010, "no-poach agreements among competitors are per se violations of the Sherman Act." *Markson v. CRST Int'l, Inc.*, No. 17-01261, 2021 WL 1156863, at *4 (C.D. Cal. Feb. 10, 2021).

To borrow Defendants' phrasing, the indictment in this case alleges "conduct that courts have previously and consistently recognized as pervasively anticompetitive and a clear violation of the Sherman Act." MTD 6. Because no meaningful difference exists between supplier-side cartels and buyer-side cartels, *see Mandeville*, 334 U.S. at 235-36, courts should treat agreements among competing employers to not poach *employees* the same as per se illegal agreements among competitors not to poach *customers*, *see Coop. Theatres* 845 F.2d at 1371-73 (holding that "'no-solicitation' agreement" was "plainly a form of customer allocation").

A contrary rule finds little support in the cases Defendants cite, nearly all of which were decided on summary judgment or after trial, and none of which involved an unadorned cartel among employers to stop competing for labor. For example, *Aydin Corp. v. Loral Corp.* applied the rule of reason to a *vertical* noncompete agreement between an employer and an executive who did "not operate at the same level of the market structure." 718 F.2d 897, 899-900 (9th Cir. 1983). *Bogan v. Hodgkins* involved a limitation on the ability of insurance agents to transfer between agency-franchises of the *same* company, which was "not a classic interfirm horizontal restraint." 166 F.3d 509, 515 (2d Cir. 1999). And unlike here, *Eichorn v. AT&T Corp.*, involved a temporary noncompete covenant that was legitimately ancillary to a separate procompetitive transaction

because it guaranteed the "workforce continuity" necessary to finalize the "sale of a corporation." 248 F.3d 131, 144-46 (3d Cir. 2001); *see infra* Part I.B.[4]

The Ninth Circuit's recent decision in *Aya* confirms the weakness of Defendants' position. In *Aya*, two healthcare staffing agencies (AMN and Aya) worked together to place travel nurses in temporary positions at healthcare facilities, with AMN serving as the "subcontractor" and Aya as the "subcontractee." 9 F.4th at 1104-06. As part of that "subcontractor-subcontractee relationship," Aya agreed to not solicit AMN's nurses, and the Ninth Circuit held that this particular "non-solicitation" agreement was ancillary to AMN and Aya's "legitimate business collaboration," and thus not per se unlawful. *Id.* at 1106-10; *see infra* Part I.B. But the Ninth Circuit in *Aya* did not, as Defendants claim, "categorically refuse[]" to hold that "no-poach agreements were a *per se* violation" (MTD 14). The court expressly "decline[d] to decide this issue" while emphasizing that there was "considerable merit" to the United States' view that "the *per se* rule applies to naked non-solicitation agreements" as "'a form of labor-market allocation.'" 9 F.4th at 1110 & n.4. *Aya* thus counsels in favor of applying the per se rule here, where the indictment alleges a naked horizontal no-poach restraint. *See id.* at 1109 ("[N]aked horizontal restraints are *always* analyzed under the *per se* standard." (emphasis added)).

The dearth of authority supporting Defendants is also apparent from their misdescription of *Kelsey K. v. NFL Enterprises, LLC*, 757 F. App'x 524 (9th Cir. 2018). That case involved "a no-poaching agreement and a wage fixing agreement," *id.* at 526, but contrary to Defendants'

---

[4] *L.A. Mem. Coliseum Comm'n v. NFL*, 726 F.2d 1381, 1389-96 (9th Cir. 1984) (involving restraint within a sports league, which "requires some territorial restrictions"); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980) (involving group boycotts, a category of conduct for which "there is more confusion about the scope and operation of the per se rule" than "any other aspect of the per se doctrine").

assertions, the court never "concluded" that such restraints "do not always demonstrate a negative economic effect" (MTD 10).  The court did not address that issue at all.  It held instead that, because the plaintiff's allegations there were "consistent with unilateral conduct," she had failed "to plausibly allege the existence of an agreement," and further that she could not show "conspiratorial intent" based on the "mere fact" that NFL executives held "annual events."  757 F. App'x at 526-27.  The passing remark that plaintiff failed "to plausibly allege *per se* illegality of either agreement" simply acknowledged that civil plaintiffs cannot plausibly allege *any* sort of per se unlawful agreement if they cannot plausibly allege an agreement at all.  *See id.*

Equally misplaced is Defendants' reliance on isolated dicta from *NCAA v. Alston*.  MTD 7-8.  *Alston* held that the NCAA's restrictions on certain education-related benefits violated Section 1 under the rule of reason.  141 S. Ct. at 2147.  Plaintiffs in that case did not seek per se condemnation, and the Court reaffirmed that the NCAA's rules were not "*per se* unlawful only because they arose in 'an industry' in which some 'horizontal restraints on competition are essential if the product is to be available at all.'"  *Id.* at 2155-58 (quoting *NCAA v. Bd. of Regents*, 468 U.S. 85, 101-02 (1984)).  As the Court explained, in the context of a sports league, "the very competitions that consumers value would not be possible" absent "some agreement among rivals."  *Id.* at 2156.  Nothing of the sort can plausibly be said about Defendants' conduct, and tellingly, they do not attempt to make such an argument.

*Alston* thus does not shield horizontal no-poach restraints from the per se rule.  Far from it. *Alston* reaffirms that the per se rule condemns horizontal restraints that "obviously threaten to reduce output and raise prices," *id.*, and that the same antitrust rules govern both sellers' and buyers' markets—including labor markets, *id.* at 2154-57 (reasoning that "fixing wages" falls "on the far side of" the anticompetitive "line," not "the great in-between"); *id.* at 2167 (Kavanaugh, J., concurring) ("Price-fixing labor is price-fixing labor.").  The precedents undergirding *Alston*,

14

moreover, confirm that regardless of the market "[t]he same legal standard (*per se* unlawfulness) applies to horizontal market division and horizontal price fixing because both have similar economic effect." *Leegin*, 551 U.S. at 904; *see Trinko*, 540 U.S. at 408 (identifying "collusion" as "the supreme evil of antitrust"); *Mandeville*, 334 U.S. at 235 (prohibiting buyer cartels). Hence, because Defendants' no-poach agreement stands on the same footing as a naked horizontal market-allocation restraint, *Alston* provides no support for applying the rule of reason in this case.

Nor can Defendants draw support from the two post-*Alston* district court orders they cite. MTD 9-11. Unlike here, both of those cases concerned no-hire provisions in franchise agreements, and neither addressed *Alston*'s application outside that context. *Conrad v. Jimmy John's Franchise, LLC*, No. 18-00133, 2021 WL 3268339, at *10 (S.D. Ill. July 30, 2021); *DeSlandes v. McDonald's USA, LLC*, No. 17-4857, 2021 WL 3187668 (N.D. Ill. July 28, 2021). In fact, *DeSlandes* reiterated that "a no-hire agreement is, in essence, an agreement to divide a market," and thus "a naked horizontal no-hire agreement would be a *per se* violation." 2021 WL 3187668, at *5-11 (quoting 2018 WL 3105955, at *6 (N.D. Ill. June 25, 2018)). Neither case bolsters Defendants' theory that *Alston* tacitly upended the per se rule's settled application to naked buyer-side cartels. *See Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

As a last-ditch effort, Defendants argue that the per se rule cannot apply because the United States has noted that some no-poach agreements are subject to the rule of reason if "ancillary" to legitimate, procompetitive collaborations, rather than being "naked" restraints of trade. MTD 11. But that is true of nearly every horizontal restraint. If the restraint is naked, the per se rule applies. If it is ancillary, the rule of reason applies. *See infra* Part I.B. That is all the government said in the documents Defendants selectively quote; it has never suggested that courts should speculate about "procompetitive effects" where, as here, an indictment charges a naked horizontal restraint.

15

*See, e.g.*, Statement of Interest of the United States, at 19, *Seaman v. Duke Univ.*, No. 15-462 (M.D.N.C. March 7, 2019) (Dkt. 325) ("[N]o-poach agreements between competing employers are *per se* unlawful unless they are reasonably necessary to a separate legitimate business transaction or collaboration between the employers.").

### B.  Defendants' Ancillary-Restraints Defense Lacks Merit

Defendants likewise cannot evade the grand jury's indictment under the guise of an "ancillary restraints" defense.  Ancillarity is not a freestanding "productivity" defense (MTD 12). It requires defendants to show that the challenged restraint is (1) "subordinate and collateral to a separate, legitimate transaction"; and (2) "'reasonably necessary' to achieving that transaction's pro-competitive purpose."  *Aya*, 9 F.4th at 1109.  But neither of those fact-intensive elements can be discerned from this indictment, which plainly charges a naked horizontal conspiracy with no procompetitive venture and no subordinate, collateral, or reasonably-necessary restraint. Defendants' contrary assertions lack merit and, in any event, wander far beyond the face of the indictment.  *See Kelly*, 874 F.3d at 1047 (limiting review to "the four corners of the indictment"); *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993) ("[A] Rule 12(b) motion to dismiss is not the proper way to raise a factual defense.").

### 1.  Nothing in the indictment suggests that the no-poach restraint was subordinate and collateral to a separate, procompetitive venture

Defendants' theory collapses out of the gate because they identify no allegations indicating that the conspirators themselves carried out a legitimate transaction or venture to which the no-poach restraint could be subordinate and collateral.  For good reason.  Nothing of the sort can be gleaned from face of the indictment.  That is the end of the analysis.

To qualify as ancillary, a restraint must be subordinate and collateral to a separate, procompetitive transaction or venture.  *See United States v. Addyston Pipe & Steel Co.*, 85 F. 271,

280-82, 291 (6th Cir.1898) (Taft, J.), *aff'd*, 175 U.S. 211 (1899).  Common examples include the sale of a business with a temporary noncompete covenant, *id.*, or an agreement among the partners of a law firm not to compete with the firm, *see Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 n.10 (D.C. Cir. 1986) (Bork, J.).  Both agreements are horizontal restraints among potential rivals not to compete.  *Polk Bros. v. Forest City Enter., Inc.*, 776 F.2d 185, 187-90 (7th Cir. 1985) (Easterbrook, J.).  But under the ancillary-restraints doctrine, such agreements are subordinate and collateral to procompetitive endeavors in the sense that they are "related to the efficiency sought to be achieved" and can "make the main transaction more effective."  *Rothery*, 792 F.2d at 224; *Addyston*, 85 F. at 290-91 (requiring "commensurate" restraints).

Yet there must exist a legitimate transaction or venture between the defendants in the first place for them to argue that a restraint is "subordinate and collateral."  This requires evidence of meaningful business integration between the parties to the challenged restraint.  *Polk*, 776 F.2d at 188 (requiring "integration of efforts"); *see Rothery*, 792 F.2d at 224 (same, "fusions or integrations of economic activity").  Defendants must do more than merely coordinate their business *decisions*—they must combine their business *functions* by integrating resources, sharing risk, and achieving efficiencies.  *See Maricopa*, 457 U.S. at 356-57 (distinguishing "independent competing entrepreneurs" from "joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss").  As Defendants implicitly recognize, without such "genuine economic integration," the ancillarity defense cannot apply.  MTD 12.

Defendants flunk their own test.  They say that the "main transaction" in this case is each conspirator's agreement with CCSD "to 'provide nurse staffing services.'"  MTD 14-15.  But independent service contracts that each conspirator separately performs for a shared client do not reflect economic integration between the parties to the no-poach restraint.  *See United States v. Apple, Inc.*, 791 F.3d 290, 325-26 (2d Cir. 2015) (rejecting similar defense where "there was no

1    joint venture or other similar productive relationship between any of the participants in the

2    conspiracy"). To qualify as "ancillary," a restraint must involve "some other 'legitimate' or clearly

3    productive transaction *between the same parties*." Phillip Areeda & Herbert Hovenkamp, ¶1908b

4    (emphasis added). That is why *Aya*, *Rothery*, and *Polk* all concerned direct agreements between

5    the parties to the challenged restraint. *Aya* involved a subcontractor and subcontractee. 9 F.4th at

6    1106, 1109. *Rothery* involved an integrated joint venture that was "identical, in economic terms,

7    to a partnership." 792 F.2d at 217-25. And *Polk* involved an entirely "new venture" in which two

8    retailers built "a joint facility" to sell "different but complementary items." 776 F.2d at 187-90.

9         Nothing like that exists here. Defendants did not serve as their coconspirators' "associate

10   vendor" (MTD 13); they did not create any "economic integration" (MTD 15); and any "facilities"

11   the conspirators shared (MTD 15) were created and provided by CCSD, not the parties to the no-

12   poach restraint. According to the indictment, Defendants and their coconspirators created nothing

13   besides an agreement to stop competing on wages, recruiting, and hiring. That is a cartel, not a

14   legitimate business collaboration: agreements among "competitors who have integrated none of

15   their productive endeavors" are "naked" restraints and thus per se illegal. *Rothery*, 792 F.2d at

16   224 n.10. Otherwise, a conspiracy among competing retailers to allocate markets or fix prices

17   might, contrary to settled law, escape the per se rule simply because the retailers contracted with

18   the same wholesaler. *See Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58-59 & n.28

19   (1977) (expressing "no doubt" that "horizontal restrictions originating in agreements among the

20   retailers" to allocate territories are "illegal per se"); *Premier Elec. Const. Co. v. Nat'l Elec.

21   Contractors Ass'n, Inc.*, 814 F.2d 358, 369 (7th Cir. 1987) (Easterbrook, J.) ("If the dealers meet

22   and agree on the price they will charge or the territories they will occupy, and then induce the

23   manufacturer to go along, that agreement will be illegal per se.").

24

### 2.   Nothing in the indictment suggests that the no-poach restraint was reasonably necessary to a separate, procompetitive venture

Defendants' theory fails for the independent reason that the indictment offers no hint of a suggestion that the no-poach restraint was reasonably necessary to the conspirators' separate arrangements with CCSD.  To be reasonably necessary, a restraint must be "an integral part" of the procompetitive arrangement, *Polk*, 776 F.2d at 190, such that it is "a necessary condition for the increased competition resulting from" the arrangement, *Blackburn v. Sweeney*, 53 F.3d 825, 828 (7th Cir. 1995); *see Addyston*, 85 F. at 282 ("[I]f the restraint exceeds the necessity presented by the main purpose of the contract, it is void.").

No such finding can be gleaned from this indictment.  Defendants note that the "purpose" of AOC's and Company A's CCSD contracts was to staff nurses who could "'provide constant care to medically fragile students.'"  MTD 14.  From that premise, Defendants broadly assert that "[a]ny alleged agreement" between AOC and Company A "must be considered ancillary to" their respective CCSD contracts, because "[c]ooperation" between "the companies providing those nurses would achieve the purpose of the CCSD contract more efficiently," whereas competition "to recruit or hire nurses already working at CCSD would not contribute to" that "purpose of providing consistent and stable medical services to CCSD's students."  MTD 14-15.

Defendants ask the wrong question and reach the wrong answer.  Because there was no venture of any kind between AOC and Company A besides the unlawful conspiracy (*supra* Part I.B.1), the Court need not address reasonable necessity.  But even putting that fatal flaw aside, nothing in the indictment supports Defendants' strained assertion that "[c]ooperation" among the conspirators was reasonably necessary to providing CCSD nurses.  They made that up out of whole cloth.  As far as the indictment is concerned, "a stable source of nurses" could have been provided just as "efficiently and effectively" whether they were employed by Defendants or their

19

cocconspirators, or whether they "switch[ed]" from one CCSD contractor to another "in the middle of the school year" (MTD 14). In all events, those issues implicate facts outside the four corners of the indictment, and are therefore not an appropriate basis for dismissal, *see Kelly*, 874 F.3d at 1047. Properly focusing on the face of the indictment itself, and construing the allegations in favor of the government, Defendants have not shown that their no-poach restraint was reasonably necessary to any procompetitive venture with their coconspirators, let alone to their separate contracts with CCSD. Defendants' assertions to the contrary invite precisely the sort of inquiry that the per se rule forbids. *See Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 695 (1978) ("[Sherman Act] precludes inquiry into the question whether competition is good or bad.").

This case, therefore, stands in stark contrast to *Aya*. The non-solicitation agreement there was "reasonably necessary" to AMN and Aya's subcontractor-subcontractee relationship because "AMN would likely be less willing or unwilling to deal with other agencies to supply travel nurses" if Aya could "abuse the relationship by proactively raiding AMN's employees." *Aya*, 9 F.4th at 1100. But the conspirators here had no such relationship of jointly staffing nurses with CCSD, and therefore could have had no reasonable need to restrain recruiting and hiring. *See id.* To the contrary, any "raiding" of employees in this case would simply have been labor-market competition, which employers cannot agree to eliminate in order to save "[t]ime" and "resources" (MTD 16). *See Anderson*, 272 U.S. at 365; *cf. also Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 38 (D.C. Cir. 2005) ("[M]ere profitability or cost savings have not qualified as a defense under the antitrust laws." (quoting *Law v. NCAA*, 134 F.3d 1010, 1023 (10th Cir. 1998))).

Defendants fare no better in seeking support from *Polk*, a case decided after "a full trial" based on "extensive findings of fact." 776 F.2d at 188, 191. In *Polk*, the Seventh Circuit held that, where two retailers built a new shopping center to sell "complementary items," their agreement not to sell the other's key products was ancillary to that "new venture" because, without it, they

20

"would not have entered into this arrangement." *Id.* at 187-90.  Here, however, Defendants worked

with CCSD for more than *three years* before hatching their no-poach scheme.  Indictment ¶¶8, 12.

Defendants cannot plausibly assert, therefore, that the no-poach restraint was "an integral part" of

their CCSD contracts.  *Polk*,776 F.2d at 190; *see Blackburn*, 53 F.3d at 828 (holding that, where a

law firm had already dissolved, an agreement among the former partners not to advertise against

each other was a "naked, not ancillary," restraint and "*per se* illegal to boot" because, "at the time

it was entered," the restraint "was not necessary for the dissolution of the partnership").

 *Rothery* likewise lends no credence to Defendants' "free rider" theory (MTD 15-16).  In

that case, a national van line (Atlas) used independent carriers as its agents, but it barred those

agents from using its equipment and facilities when handling non-Atlas business.  *Rothery*, 792

F.2d at 212-13.  The D.C. Circuit held that this rule was "ancillary" to Atlas's joint venture

because, without it, Atlas's "system as a whole could collapse." *Id.* at 221-25.  For if Atlas could

not stop agents from "free-riding" on its resources when they conducted their own business for

their own profit, Atlas would inevitably invest less in its own services, to the detriment of its

customers and, ultimately, Atlas's continued existence. *Id.* at 221-22.

 Defendants contend that a similar rationale applies here.  They assert that their

coconspirators would have gotten "a free ride" if—after Defendants recruited, vetted, trained, and

placed a nurse with CCSD—a coconspirator "could then hire that same nurse to fill one of its spots

with CCSD whilst skipping the required legwork."  MTD 16.  According to Defendants, their no-

poach restraint served the "ancillary purpose of eliminating the free ride."  MTD 16.

 That is not how free-rider justifications work.  As *Rothery* explains, "[a] free ride occurs

when one party to an arrangement reaps benefits for which another party pays, though that transfer

of wealth is not part of the agreement between them," "thus rendering the common enterprise less

effective."  792 F.2d at 212-13.  But without a common enterprise, "free riding" is simply

competition. *Cf. Polygram*, 416 F.3d at 38 (rejecting similar defense where "'free-riding'" was "nothing more than the competition of products"). In fact, "'free riding' is the way the cartel unravels." *Premier*, 814 F.2d at 370. In a price-fixing case, for example, "price cutting by individual firms is a form of 'free riding'" from "the perspective of the cartel" since the "free rider is taking advantage of the supra-competitive price fixed by agreement." *Id.* Yet the cartel cannot "turn around and try to squelch lower prices . . . by branding the lower prices 'free riding!'" *Id.*

So, too, here. What Defendants call "free riding" is actually labor-market competition unhindered by an employer cartel. *See* Phillip Areeda & Herbert Hovenkamp, ¶2223b ("[O]ften practices that are stated to be free riding are nothing more than competition."). As explained, every cartel sees competition as a form of free-riding, and Defendants are no different. But accepting such a theory would essentially "abolish the *per se* rule" whenever cartelists wish to stop their coconspirators from "cheating" "on the price they will charge or the territories they will occupy." *See Premier*, 814 F.2d at 369-70. Defendants' conflation of competition with free-riding is "'nothing less than a frontal assault on the basic policy of the Sherman Act.'" *Polygram*, 416 F.3d at 38 (quoting *Prof'l Eng'rs*, 435 U.S. at 695).

## II. Prosecuting Defendants Under Section 1 Of The Sherman Act For Conspiring To Divide Labor Markets and Fix Wages Is Consistent With Due Process

Defendants received all the process they were due in being charged with conspiracy to allocate markets and fix wages. Defendants do not deny this as to wage fixing. But they say it violates "due process" to indict them for a no-poach restraint, as they purportedly had no "opportunity to know that no-poach agreements are *per se* violations." MTD 16-17.

Not so. Due process requires that "the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997). That standard is met here. Horizontal market allocation has

been per se illegal since 1899, *Addyston*, 175 U.S. at 241-42, and no-poach restraints were subject to the same rule well before Defendants' conspiracy began in 2016 (*supra* Part I.A).  Phillip Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 2013b (3d ed. 2007) (categorizing no-poach restraints as "generally unlawful per se").   That the government conveyed these principles in a contemporaneous guidance document only confirms the clarity of the law at the time of Defendants' conspiracy, and if nothing else, it hardly suggests Defendants *lacked* fair notice.  *See United States v. Cinemette Corp. of Am.*, 687 F. Supp. 976, 979-82 (W.D. Pa. 1988) (similar, involving DOJ press release).  Moreover, given Defendants' tacit concession of fair notice that fixing wages is a per se violation, it makes little sense for them to argue that due process requires dismissal of an indictment charging them with fixing wages *and* allocating labor markets.[5]

## III. Settled Precedent Forecloses Defendants' Challenge To The Constitutionality Of Applying The Per Se Rule To Their No-Poach Conspiracy

Defendants also maintain that charging their no-poach restraint as a per se offense is "unconstitutional" because the per se rule purportedly imposes "irrebuttable presumptions" that take from the jury an unspecified "element" of the offense.  MTD 18-19.  But the Ninth Circuit rejected essentially the same theory decades ago: "The *per se* rule does not operate to deny a jury decision as to an element of the crime."  *United States v. Manufacturers' Ass'n*, 462 F.2d 49, 52 (9th Cir. 1972).  Nor does the per se rule impose "an unconstitutional conclusive presumption."

---

[5] To the extent Defendants suggest that "[t]he Sherman Act itself" is somehow facially invalid (MTD 17), their contention flies in the face of more than a century of Supreme Court precedent holding that even a fact-intensive prosecution under the rule of reason passes constitutional muster. *Nash v. United States*, 229 U.S. 373, 376-78 (1913) (finding, after *Standard Oil Co. v. United States*, 221 U. S. 1 (1911), "no constitutional difficulty in the way of enforcing the criminal part of the" Sherman Act); *see United States v. Miller*, 771 F.2d 1219, 1225 (9th Cir. 1985) (rejecting similar challenge as "frivolous").

*Id.* at 50.  The per se rule is instead an interpretation of Section 1 under which certain agreements, such as price fixing and market allocation, are "in themselves unreasonable and unlawful restraints."  *Id.* at 50-52 (quoting *Socony-Vacuum*, 310 U.S. at 218).

Defendants ignore this controlling authority in favor of a blog post and a law-review article. No matter.  The law is clear.  While, at trial, Defendants may present probative evidence of legally cognizable defenses (*e.g.*, ancillarity), due process does not entitle them to confuse the jury with irrelevant and meritless arguments that their no-poach restraint supposedly "served a pro-competitive purpose" (MTD 18)—much less to have the indictment dismissed at the threshold. *See Manufacturers'*, 462 F.2d at 52 ("'[U]nreasonableness' is an element of the crime only when no *per se* violation has occurred."); *see also United States v. Sanchez*, 760 F. App'x 533, 535 (9th Cir. 2019) (same), *cert denied*, 140 S. Ct. 909 (2020).[6]

## IV. The Indictment Establishes A Clear Factual Nexus To Interstate Commerce

Equally meritless is Defendants' crabbed view of Sherman Act jurisdiction.  Section 1 of the Sherman Act extends to all activities in the *flow of* interstate commerce, as well as local activities that, if successful, would *substantially affect* interstate commerce.  *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 241-47 (1980); *see Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 328-33 (1991).  The indictment here satisfies both standards.

//

//

//

---

[6] Every circuit to address the issue, moreover, has followed the Ninth Circuit.  *United States v. Giordano*, 261 F.3d 1134, 1143-44 (11th Cir. 2001); *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1195-96 (3d Cir. 1984); *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 683 (5th Cir. 1981); *United States v. Koppers Co.*, 652 F.2d 290, 293-95 (2d Cir. 1981); *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979).

### A.  The Indictment Alleges Conduct in the Flow of Interstate Commerce

Conduct is in the flow of interstate commerce when it occurred in, or was integral to a business operating in, interstate commerce.  *Goldfarb v. Va. State Bar*, 421 U.S. 773, 783-85 (1975); *Canadian Am. Oil Co. v. Union Oil Co. of Cal.*, 577 F.2d 468, 471 (9th Cir. 1978) (holding defendant acted in "flow of interstate commerce" where its "business with" plaintiffs "was an ingredient of [its] interstate production and distribution scheme").  This inquiry focuses on "not only the location of the transaction and the immediate parties, but all other conceivable links with interstate commerce, including the interests of secondary parties and the passage across state lines of goods and services related to the transaction." *United States v. Romer*, 148 F.3d 359, 365 (4th Cir. 1998), *abrogated on other grounds by Neder v. United States*, 527 U.S. 1 (1999).  Of particular importance is the conspirators' receipt of federal funds, which "is likely sufficient by itself to establish an interstate nexus, given that the funds flowed in interstate commerce." *United States v. Vega-Martinez*, 949 F.3d 43, 49 (1st Cir. 2020) (citing *Goldfarb*, 421 U.S. at 783-84).

*Goldfarb* is instructive.  There, a local bar association set minimum fees for lawyer-performed title examinations.  421 U.S. at 783-85.  Although the conduct involved only lawyers in a single county in Virginia, and the title examinations occurred within the state's borders, the Court nevertheless found the "necessary connection" to interstate commerce.  *Id.*  Because the underlying real-estate transactions involved funds from outside Virginia, including federally guaranteed loans, the Court held that the restrained legal services were "inseparable" from "the interstate aspects of real estate transactions." *Id.*

The indictment here amply establishes flow-of-commerce jurisdiction in alleging that Defendants' business activities stretched across different states, they sent and received payments in interstate commerce, and their conspiracy involved federal funds. *See id.*; *Vega-Martinez*, 949 F.3d at 49-50; *Union Oil*, 577 F.2d at 471.  AOC, for example, was an Ohio company that, for

years, "provided contract healthcare staffing services *in several states*." Indictment ¶3 (emphasis added). Likewise, Defendant Hee, as an AOC regional manager, conducted business with "new customers that needed nurse staffing services in *Nevada*, *Arizona*, *and Utah*." *Id.* ¶4 (emphasis added). Coconspirator, Company A, also "provided contract healthcare staffing services *in several states*." *Id.* ¶5 (emphasis added). The indictment further makes clear that the payments CCSD made to AOC and Company A for nursing services were integral to Defendants' activities (else, they generated no revenue), and that, in addition, CCSD's payments originated in federal funds allocated to the State of Nevada "from Medicaid, managed through the federal Centers for Medicare and Medicaid Services, a federal agency in Baltimore County, Maryland and part of the United States Department of Health and Human Services." *See id.* ¶¶13, 14.d, 14.g, 15.a-15c.

Defendants do not, and cannot, deny these allegations, which are taken as "true" and construed "in favor of the government" at this stage, *Milovanovic*, 678 F.3d at 717-19. Nor do they seriously dispute that the allegations establish flow-of-commerce jurisdiction as a matter of law. Defendants instead quibble that CCSD and some nurses were "located" in Nevada (MTD 19-20). But "the location of the transaction and the immediate parties" is not dispositive, *Romer*, 148 F.3d at 365, particularly where, as here, the indictment alleges continuous interstate business activity and receipt of federal funds, *Goldfarb*, 421 U.S. at 783-85; *see Romer*, 148 F.3d at 365-66 (holding that a "seemingly local bid-rigging" scheme "initiated by out-of-state lenders" was in "interstate commerce," even though "the auctions involved Virginia real property," "took place entirely within the Commonwealth," and all participants "were Virginia residents").

While Defendants ignore *Goldfarb*, they try to sidestep *Vega-Martinez* on the flimsy premises that their conspiracy was somehow "one level removed from the federal funding," and that the indictment here "fails to allege that the money paid to AOC and Company A actually came from federal funds" (MTD 21). Neither point holds up. The relevant jurisdictional allegations in

*Vega-Martinez* are materially identical to those in this case.[7]  The court there held that, because the bus contracts targeted by the conspirators were allegedly "funded in substantial part" by the local government, whose "funding included substantial federal funding," the indictment adequately alleged that "the bus contracts were funded or supported at least in part by federal funds," and thus in the flow of interstate commerce. 949 F.3d at 49.  The same is true here.  This indictment alleges that the CCSD payments to Defendants "were funded in substantial part by the State of Nevada," and that "[t]he State of Nevada funding included a substantial portion of federal funding from Medicaid."  Indictment ¶15c.  Such allegations establish that Defendants received payments that "were funded or supported at least in part by federal funds," and therefore in the flow of interstate commerce. *Vega-Martinez*, 494 F.3d at 49.  Defendants will have an opportunity to contest those factual allegations at trial, but now is not the time.

### B. The Indictment Alleges Conduct That Substantially Affected Interstate Commerce

The indictment also alleges conduct that had a substantial effect on interstate commerce.  The "effects" test focuses on the potential harm that would ensue, "as a matter of practical economics," were the conspiracy successful. *Pinhas*, 500 U.S. at 330-32.  When a case involves "horizontal agreements to fix prices or allocate territories within a single State," courts "have based

---

[7] *Compare* Indictment ¶15c ("[T]he payments that CCSD made to AOC and to Company A for the services rendered by their respective nurses were funded in substantial part by the State of Nevada.  The State of Nevada funding included a substantial portion of federal funding from Medicaid, managed through the federal Centers for Medicare and Medicaid Services, a federal agency based in Baltimore County, Maryland and part of the United States Department of Health and Human Services."), *with United States v. Vega-Martinez*, Indictment ¶21, 2015 WL 2441407 (D. Puerto Rico) ("At the time of Auction Number 2014-49, 'School Transportation Services,' Municipality of Caguas school bus transportation contracts were funded in substantial part by the Puerto Rico Department of Education ('PRDE').  The PRDE funding included substantial federal funding from the U.S. Department of Education Title I and Title II grants.").

1    jurisdiction on a general conclusion that the defendants' agreement 'almost surely' had a

2    marketwide impact and therefore an effect on interstate commerce."  *Id.* at 331.

3         But an indictment need not allege "interstate effects caused by the illegal conduct itself."

4    *Freeman*, 322 F.3d at 1143.  It need only allege that the activities "infected" by the illegal conduct

5    had a "substantial effect on interstate commerce."  *Id.*; *see McLain*, 444 U.S. at 242-43 (focusing

6    on defendants' "brokerage activity," not their "conspiracy to fix commission rates").  For example,

7    Section 1 would reach a conspiracy that fixed the local prices of fruit if the infected activity (*i.e.*,

8    the sale of fruit) substantially affected interstate commerce.  *Mandeville*, 334 U.S. at 236-38

9    (finding jurisdiction over conspiracy to fix the price of beets bought and processed in California).

10   So, while "[m]onopolizing the local lemonade stand doesn't get you into federal court," *Freeman*,

11   322 F.3d at 1143, fixing the price of lemons sold to that stand could.  *See Mandeville*, 334 U.S. at

12   236 ("[A] conspiracy with the ultimate object of fixing local retail prices is within the Act, if the

13   means adopted for its accomplishment reach beyond the boundaries of one state.").

14        Just so here.  The indictment makes clear that the infected activity (Defendants'

15   employment and staffing of nurses) substantially affected interstate commerce.  Not only did

16   Defendants employ nurses and other healthcare workers in multiple states, but their entire business

17   model of staffing nurses with CCSD depended on the payment and receipt of monies traveling in

18   interstate commerce.  Indictment ¶¶15a, 15b, 15d.  Regardless of the impact of the *infecting*

19   *conduct* (Defendants' conspiracy to allocate labor markets and fix wages), a commonsense reading

20   of the indictment leaves no doubt that the *infected activity* substantially affected interstate

21   commerce.  *See United States v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007) ("[A]n indictment

22   should be read in its entirety, construed according to common sense, and interpreted to include

23   facts which are necessarily implied." (internal quotation marks omitted)).

24

According to Defendants, however, the indictment should have alleged "that the *restraint itself* (the alleged no-poach agreement) had a substantial adverse effect on interstate commerce." MTD 20 (emphasis added).  But that is not the law, as Defendants' own cases show.  *Pinhas*, 500 U.S. at 334-35 (Scalia, J., dissenting) (noting jurisdiction does not depend on "the effects of the restraint itself"); *Freeman*, 322 F.3d at 1143-44 (same).  Those decisions rightly focus on "the infected activities, not the infection," *id.*, because Sherman Act jurisdiction "does not require an explicit showing of a causal link between the unlawful conduct and interstate commerce," *Furlong v. Long Island Coll. Hosp.*, 710 F.2d 922, 926 (2d Cir. 1983); *see Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59, 67 (2d Cir. 1997) (same).

In any event, the indictment satisfies even Defendants' flawed test.  The conspiracy itself affected interstate commerce in that Defendants used the interstate wires to email their coconspirators for purposes of carrying out the conspiracy.  Indictment ¶¶14a, 14b, 14d.  Also, the conspiracy, if successful, would have reduced the amount of money AOC and Company A paid their nurses via interstate transactions and, in turn, the companies' labor costs.  *Id.* ¶14d ("If anyone threatens us for more money, we will tell them to kick rocks!"), ¶15b.  The illicit benefits of this artificial reduction in labor costs inevitably would have flowed across state lines given the conceded "fact that AOC operated in multiple states" (MTD 22).  *See id.* ¶15d.  The indictment's allegations thus are more than sufficient to plead that Defendants' conspiracy itself had a "not insubstantial" effect on interstate commerce, *McLain*, 444 U.S. at 246.

Defendants also misread *United States v. Oregon State Medical Society* as categorically precluding jurisdiction based on the "payment" of money "in interstate commerce" (MTD 20-21).  *Oregon* held only that it was not "clearly erroneous" to reject jurisdiction where a business was "wholly intrastate" and its only "out-of-state" payments were "few, sporadic and incidental."  343

U.S. 326, 330, 338-39 (1952). Even assuming *Oregon* remains good law,[8] it has no bearing on this case. The indictment here alleges that Defendants operated "in several states," and it clearly implies that the interstate payments they received and dispersed were myriad, routine, and essential. *See* Indictment ¶¶3-4, 15a-15b. Contrary to Defendants' assertions, then, this indictment raises no "significant constitutional" issue (MTD 20-21). Congress intended the Sherman Act to cover the full scope of its commerce power, *Pinhas,* 500 U.S. at 329 n.10, and Defendants offer no sound reason to conclude that payments moving "via wire from one bank to another across state lines" cannot "substantially affect[] interstate commerce" (MTD 21), especially when such payments are only one of several activities directly affecting interstate commerce. *See Gulf Coast Hotel-Motel Ass'n v. Mississippi Gulf Coast Golf Course Ass'n*, 658 F.3d 500, 507 (5th Cir. 2011) (finding jurisdiction alleged in part because "money was sent across state lines").

## CONCLUSION

The motion to dismiss should be denied.

DATED: October 1, 2021                          Respectfully submitted,


                                                             /s/
                                                   _____
                                                   ALBERT B. SAMBAT
                                                   CHRISTOPHER J. CARLBERG
                                                   MIKAL J. CONDON
                                                   Trial Attorneys
                                                   Antitrust Division
                                                   U.S. Department of Justice

---

[8] *See* Phillip Areeda & Herbert Hovenkamp, ¶266h ("As a general matter, pre-*McLain* cases finding no interstate commerce are best ignored." (footnote omitted)).